RECEIPT # _____
AMOUNT $ _150⁰⁰_____
SUMMONS ISSUED ✓ _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INFORMATION DYNAMICS, LLC, On Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SONUS NETWORKS, INC., PAUL R. JONES, EDWARD N. HARRIS, J. MICHAEL O'HARA, HASSAN M. AHMED and STEPHEN J. NILL,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## 04 CV 10308 DPW

MAGISTRATE JUDGE _Bowler_

DEMAND FOR JURY TRIAL

## INTRODUCTION

1.     This is an action on behalf of purchasers of Sonus Networks, Inc. ("Sonus" or the "Company") common stock during the period from April 9, 2003 to February 11, 2004 (the "Class Period").  Sonus is a provider of voice infrastructure solutions for the new public network.  The Company's products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks.  By enabling voice traffic to be carried over these packet-based networks, the Company's products will accelerate the convergence of voice and data into the new public network.  The Company's suite of voice infrastructure solutions includes the GSX9000 Open Services Switch, the Insignus Softswitch and the Sonus Insight Management System.

2.     During the Class Period, defendants caused Sonus's shares to trade at artificially inflated levels through the issuance of false and misleading financial statements.  As a result of this inflation, Sonus was able to complete a public offering of 20 million shares, raising proceeds of $61 million on April 22, 2003.

3.     On February 11, 2004, the Company issued a press release entitled "Sonus Networks Provides Update on Status of Its Q4 and FY2003 Financial Results."  The press release stated in part:

> Sonus Networks today provided additional information regarding the delay in reporting its fourth quarter and full fiscal year financial results for the year ended December 31, 2003.  In connection with the year-end audit, Sonus Networks and its independent auditors have identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods.
>
> The revenue issues identified relate to the proper timing of recognizing revenue from certain customer transactions, and not whether the sales can be recorded as revenue. For the customer transactions under review, the products have been delivered, customers are using the products in their networks and Sonus

- 1 -

Networks has either received payment or is receiving payment for the products in the ordinary course. The Company is reassessing the proper periods in which revenue should be recognized for these transactions. Revenue or deferred revenue in periods previously reported could increase, decrease or remain unchanged in those periods as a result of this reassessment.

In response to the issues identified, the Company has taken the following steps:

—    The Company is performing a detailed review of the revenue timing issues and practices and of certain other financial statement accounts.

—    The Audit Committee of Sonus Networks' Board of Directors is conducting an independent investigation, employing the services of Hale and Dorr LLP and PricewaterhouseCoopers.

—    The Company has terminated certain non-executive employees.

—    Sonus Networks has notified the Securities and Exchange Commission of the Company's independent investigation and is fully reporting the results of that ongoing investigation to the Commission.

"We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting," said Hassan Ahmed, president and CEO, Sonus Networks. "The Company responded promptly by taking appropriate measures to address these matters. We assure our shareholders, customers and employees that our management and Board of Directors are committed to taking all necessary steps to complete our review in an expeditious and comprehensive manner, and to prevent such problems from occurring in the future."

At this time, Sonus Networks cannot provide an anticipated date for the completion of its review or the year-end audit, or for the rescheduling of the release of its fourth quarter and fiscal year results for the year ended December 31, 2003.

4.    The stock dropped below $6 per share on this news.

## JURISDICTION AND VENUE

5.    The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act as defendant Sonus and/or the Individual Defendants conduct business in and the wrongful conduct took place in this District.

## THE PARTIES

6.      Plaintiff Information Dynamics, LLC purchased Sonus common stock as detailed in the attached Certification and was damaged thereby.

7.      Defendant Sonus is a provider of voice infrastructure solutions for the new public network. The Company's products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks. By enabling voice traffic to be carried over these packet-based networks, the Company's products will accelerate the convergence of voice and data into the new public network. The Company's suite of voice infrastructure solutions includes the GSX9000 Open Services Switch, the Insignus Softswitch and the Sonus Insight Management System.

8.      Defendant Paul R. Jones ("Jones") was a Vice President of Sonus. Jones assisted in the preparation of the false financial statements and repeated the contents therein to the market.

9.      Defendant Edward N. Harris ("Harris") was a Vice President of Sonus. Harris assisted in the preparation of the false financial statements and repeated the contents therein to the market.

10.     Defendant J. Michael O'Hara ("O'Hara") was a Vice President of Sonus. O'Hara assisted in the preparation of the false financial statements and repeated the contents therein to the market.

11.     Defendant Hassan M. Ahmed ("Ahmed") was President, Chief Executive Officer and a director of Sonus. Ahmed assisted in the preparation of the false financial statements and repeated the contents therein to the market.

12.     Defendant Stephen J. Nill ("Nill") was Chief Financial Officer of Sonus. Nill assisted in the preparation of the false financial statements and repeated the contents therein to the market.

- 3 -

13.    Defendants Jones, Harris, O'Hara, Ahmed and Nill are the "Individual Defendants." They are liable for the false statements pleaded in ¶¶15-16, 18 and 22-23, as those statements were "group-published" information.

## BACKGROUND

14.    Sonus is a provider of voice infrastructure solutions for the new public network. The Company's products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks. By enabling voice traffic to be carried over these packet-based networks, the Company's products will accelerate the convergence of voice and data into the new public network. The Company's suite of voice infrastructure solutions includes the GSX9000 Open Services Switch, the Insignus Softswitch and the Sonus Insight Management System.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

15.    On April 9, 2003, the Company issued a press release entitled "Sonus Networks Reports 2003 First Quarter Financial Results; Revenues Increase 27% Sequentially, Loss Narrows to $0.02 Per Share." The press release stated in part:

> Sonus Networks, Inc., a leading provider of voice infrastructure solutions for the new public network, today reported its financial results for the first quarter ended March 31, 2003, in accordance with U.S. generally accepted accounting principles (GAAP).
>
> Revenues for the first quarter of fiscal 2003 were $16.0 million compared with $12.7 million in the fourth quarter of fiscal 2002. Net loss for the first quarter of fiscal 2003 was $4.4 million or $0.02 per share compared with a net loss for the fourth quarter of fiscal 2002 of $12.8 million or $0.07 per share. Revenues for the first quarter of fiscal 2002 were $21.2 million and the net loss for the first quarter of fiscal 2002 was $16.2 million or $0.09 per share.
>
> *"Our financial results for the first quarter reflected good progress toward our business objectives," said Hassan Ahmed, president and CEO, Sonus Networks. "We grew our revenues 27 percent over last quarter, and by continuing to manage our business with precision, we further narrowed our net loss. In Q1,*

- 4 -

*we also continued to add new customers around the globe and made important additions to our product family."*

16.    On April 22, 2003, the Company issued a press release entitled "Sonus Networks

Announces Sale of 20 Million Shares of Common Stock." The press release stated in part:

Sonus Networks, a leading provider of voice infrastructure solutions for the new public network, today announced that it has completed a public offering of 20 million shares of Common Stock at a per share price of $3.05. The offering was made under an effective registration statement.

*"Enhancing our financial strength has been an important component of our strategy as we seek to expand our partnerships with some of the world's largest service providers," said Hassan Ahmed, president and CEO, Sonus Networks. "The financial transaction announced today bolsters our balance sheet, and positions us to build on our success in providing the next-generation, carrier-class solutions that enable voice services to be delivered over packet-based networks."*

17.    On June 5, 2003, CNNfn issued a transcript of an interview with defendant Ahmed

which stated in part:

DASS:  Your stock price has seen an amazing run. We were just putting up the chart there a few minutes ago. What are going to be the key drivers to keep that momentum going?

*AHMED:  Well, as I said, I think the – we're approaching certainly 2003 with an awful lot of confident [sic] because we're seeing not only a transition of the way people are – way carriers are spending their capital towards the types of things that we do, but we're also seeing a much broader customer base looking at deploying or moving forward with deployment of this technology. So we see a broader set of carriers moving forward. We see – we see capital being devoted to this.*

*And we, in general, find that every – ultimately every carrier in the world is going to make a transition to packet-oriented network. This is the way networks of the future will be built. Some of them have already voted and started down this path with us and we feel that there are a lot more to follow. So I think the catalysts are very strong for people building out this infrastructure.*

18.    On July 14, 2003, the Company issued a press release entitled "Sonus Networks

Reports 2003 Second Quarter Financial Results." The press release stated in part:

- 5 -

Sonus Networks, Inc., a leading provider of voice infrastructure solutions for the new public network, Thursday reported its financial results for the second quarter ended June 30, 2003.

Revenues for the second quarter of fiscal 2003 were $21.4 million compared with $16.0 million for the first quarter of fiscal 2003 and $21.3 million for the second quarter of fiscal 2002. Net loss for the second quarter of fiscal 2003 was $3.2 million or $0.01 per share compared with a net loss for the first quarter of fiscal 2003 of $4.4 million or $0.02 per share and a net loss of $17.8 million or $0.09 per share for the second quarter of fiscal 2002.

Revenues for the first six months of fiscal 2003 were $37.4 million compared with $42.5 million in the same period last year. Net loss for the first six months of fiscal 2003 was $7.6 million or $0.04 per share compared with a net loss for the first six months of fiscal 2002 of $34.0 million or $0.18 per share.

19.     On July 18, 2003, *Bloomberg* issued a release entitled "Sonus is 'Driving Toward

Profitability,' Chief Executive Says." The press release stated in part:

Sonus Networks Inc., a telecommunications-equipment maker, is trying to become profitable, Chief Executive Officer Hassan Ahmed said.

*"We're definitely driving toward profitability as fast as we can," Ahmed said in a televised interview with Bloomberg News. He said he hasn't given guidance on the third quarter and whether Sonus would post a profit.*

*Ahmed said the company expects sales from outside the U.S. to eventually increase to 50 percent of its total revenue.*

20.     On July 18, 2003, defendant Harris sold 30,000 Sonus shares at $6.82 per share, for

proceeds of $204,600.

21.     On July 22, 2003, defendant O'Hara sold 55,000 Sonus shares at $6.82-$7.03 per

share, for proceeds of $381,200.

22.     On August 1, 2003, the Company issued a press release entitled, "Sonus Networks

Issues Statement Regarding Incorrect Report On Financial Guidance." The press release stated in

part:

Sonus Networks today issued the following statement regarding erroneous and false information reported by Multex on July 31. An article appeared on Multex Investor indicating that Sonus Networks had revised its financial guidance for Q3 FY2003

- 6 -

and for the fiscal year 2003. The information included in the article was incorrect and was not provided by the company.

*With regard to its projected future results, Sonus Networks refers you to the financial guidance provided as part of its Q2 quarterly financial conference call on July 10, 2003, which included, among other things, that it expects its revenues to increase in the third quarter of FY2003 by 15-20% over reported second quarter 2003 revenues of $21.4 million. For more detailed information on the guidance provided by the company, please refer to the webcast of this conference call, which can be accessed in the Investor Relations section of Sonus' web site at www.sonusnet.com.*

23.    On October 8, 2003, the Company issued a press release entitled "Sonus Networks Reports 2003 3Q Fincl Results; Rev Grow 34% Sequentially, 285% Over Previous Year; Co Achieves Qtrly Profit." The press release stated in part:

Sonus Networks Inc. - Westford, Mass.

3rd Quar Sept. 30:

|  | 2003 | 2002 |
|---|---|---|
| Revenue | $28,644,000 | $7,445,000 |
| Net income | 1,209,000 | (21,638,000) |
| Avg shrs (diluted) | 239,446,000 | 191,823,000 |
| Shr earns |  |  |
| Net income | .01 | (.11) |

Figures in parentheses are losses.

Excluding amortiation [sic] of stock-based compensation, amortization of goodwill and purchased intangible assets, and the write-off of goodwill, Sonus earned $2.35 million, or a penny a share, in the latest quarter, up from a loss of $14.6 million, or 8 cents a share, a year ago.

Analysts had expected the company to lose a penny a share for the quarter, according to a survey of analysts compiled by Thomson First Call.

Shares of Sonus closed the regular session Wednesday at $8.30, up 27 cents a share, or 3.4%. In after-hours trading, shares rose further to $8.93 a share.

24.    On October 9, 2003, *Bloomberg* issued a release entitled "Sonus Networks' Ahmed on Earnings Outlook." The release stated in part:

Hassan Ahmed, chief executive of Sonus Networks Inc., talks with Bloomberg's Carol Massar from Boston about the company's third-quarter profit, spending by

telecommunications companies and outlook for earnings growth. Sonus, a telecommunications-equipment maker, reported net income of $1.2 million, its first-ever quarterly profit.

*       *       *

AHMED:  Good morning, Carol. How are you?

MASSAR:  I'm doing well. And your stock's doing well in the pre-market. It is trading higher already. Investors certainly seem improved [sic] with your earnings results. What was the reason behind the earnings improvement?

AHMED:  Well, one of the things that we've been able to do this year is consistently grow our top line, our revenues, based on not only the strength of our existing customers but the addition of major new customers such as Verizon, for example, into the mix. And so, our top line has grown. We've been managing our expenses very carefully and all that's led to a profit. And also, we generated about $4 million in cash from operations.

MASSAR:  Viewing the marketplace really, we're not seeing a lot of companies spending, and now you're saying that we were starting to see that. My understanding is that earnings will improve because companies like Qwest and Global are stepping up their spending. Who else is placing orders with you guys?

AHMED:  Well, you know, it's interesting, the – in our marketplace what's happening is that while overall telcom spending still isn't increasing carriers are being much more careful about how they're spending the money, and they're shifting expenditure towards their next-generation networks. And what we do in terms of building next-gen voice networks has – is a very high priority for a number of these carriers. So, really across the board in the U.S. as well as overseas we're seeing carriers take packet collecting and voice-over-IP technology a lot more seriously and stepping up to deploying it.

*MASSAR:  What does that mean for your earnings going forward then?*

*AHMED:  Well, certainly a big part of our focus is on growing our company and broadening our customer base. So, we're very much focused on continuing to grow the top line in our company and, obviously as a result of that, grow the bottom line.*

*MASSAR:  What about the bottom line? Take this quarter. Analyst consensus expecting earnings to be flat. Is that what you're expecting at this point?*

*AHMED:  We're – our guidance that we offered last night certainly is for earnings to come in about the same level as it did this quarter and for the top line to grow somewhere between 10 and 15 percent.*

- 8 -

25.    On October 10, 2003, defendant Jones sold 100,000 Sonus shares at $8.58 per share,

for proceeds of $858,000.

26.    On October 22, 20023, defendant O'Hara sold 13,750 Sonus shares at $7.85-$7.91

per share, for proceeds of $108,413.

27.    On January 20, 2004, *Bloomberg* issued a release entitled "Sonus Networks Delays

Release of 4th-Qtr Results Pending Audit." The release stated in part:

> Sonus Networks Inc., a maker of switches and networking equipment for Internet
> calling, said it delayed the release of its fourth-quarter results pending the completion
> of an audit.

28.    On February 11, 2004, the Company issued a press release entitled "Sonus Networks

Provides Update on Status of Its Q4 and FY2003 Financial Results." The press release stated in

part:

> Sonus Networks today provided additional information regarding the delay in
> reporting its fourth quarter and full fiscal year financial results for the year ended
> December 31, 2003. In connection with the year-end audit, Sonus Networks and its
> independent auditors have identified certain issues, practices and actions of certain
> employees relating to both the timing of revenue recognized from certain customer
> transactions and to certain other financial statement accounts, which may affect the
> Company's 2003 financial statements and possibly financial statements for prior
> periods.
>
> The revenue issues identified relate to the proper timing of recognizing
> revenue from certain customer transactions, and not whether the sales can be
> recorded as revenue. For the customer transactions under review, the products have
> been delivered, customers are using the products in their networks and Sonus
> Networks has either received payment or is receiving payment for the products in the
> ordinary course. The Company is reassessing the proper periods in which revenue
> should be recognized for these transactions. Revenue or deferred revenue in periods
> previously reported could increase, decrease or remain unchanged in those periods as
> a result of this reassessment.
>
> In response to the issues identified, the Company has taken the following
> steps:
>
> –    The Company is performing a detailed review of the revenue timing
> issues and practices and of certain other financial statement accounts.

–   The Audit Committee of Sonus Networks' Board of Directors is conducting an independent investigation, employing the services of Hale and Dorr LLP and PricewaterhouseCoopers.

–   The Company has terminated certain non-executive employees.

–   Sonus Networks has notified the Securities and Exchange Commission of the Company's independent investigation and is fully reporting the results of that ongoing investigation to the Commission.

"We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting," said Hassan Ahmed, president and CEO, Sonus Networks. "The Company responded promptly by taking appropriate measures to address these matters. We assure our shareholders, customers and employees that our management and Board of Directors are committed to taking all necessary steps to complete our review in an expeditious and comprehensive manner, and to prevent such problems from occurring in the future."

At this time, Sonus Networks cannot provide an anticipated date for the completion of its review or the year-end audit, or for the rescheduling of the release of its fourth quarter and fiscal year results for the year ended December 31, 2003.

## SONUS'S FALSE FINANCIAL
## REPORTING DURING THE CLASS PERIOD

29.     In order to inflate the price of Sonus's stock and complete the $60 million secondary offering, defendants caused the Company to falsely report its results for Q3 2003 to Q4 2003 through improper revenue recognition.

30.     The FY 2003 results were included in Form 10-Qs filed with the SEC. The results were also included in press releases disseminated to the public.

31.     Sonus will have to admit that it inappropriately recorded transactions included in its FY 2003 results, and will have to restate those results to remove millions in improperly reported revenues, such that its FY 2003 financial statements were not a fair presentation of Sonus's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

32.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

33.    In Sonus's 2002 Form 10-K, it represented that it recognized revenue in accordance with GAAP.

34.    Pursuant to GAAP, which describes the accounting for revenues, revenue should not be recognized unless there is persuasive evidence of an agreement, collection is probable and delivery has occurred.

35.    During the Class Period, Sonus improperly recognized revenue even though these conditions did not exist.

36.    Ultimately, on February 11, 2004, Sonus announced that its results would be delayed. However, in actuality, the Company will need to restate its FY 2003 results to eliminate millions in revenue that had been improperly recorded and increase its past-stated expenses.

37.    The fact that Sonus will restate its financial statements for FY 2003 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Sonus was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. The restatement of past financial

- 11 -

statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Sonus's restatement will not be due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatement will be an admission by Sonus that its previously issued financial results and its public statements regarding those results were false.

38.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

- 12 -

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

39.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

40.    Plaintiff incorporates ¶¶1-39 by reference.

41.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

42.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Sonus common stock during the Class Period.

43.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sonus common stock. Plaintiff and the Class

- 14 -

would not have purchased Sonus common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

44.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Sonus common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

45.     Plaintiff incorporates ¶¶1-44 by reference.

46.     The executive officers of Sonus prepared, or were responsible for preparing, the Company's press releases and SEC filings. The Individual Defendants controlled other employees of Sonus. Sonus controlled the Individual Defendants and each of its officers, executives and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Sonus common stock (the "Class") on the open market during the Class Period. Excluded from the Class are defendants, directors and officers of Sonus and their families and affiliates.

48.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period Sonus had more than 244 million shares of stock outstanding, owned by thousands of persons.

- 15 -

49.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such equitable/injunctive or other relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 13, 2004

By its attorneys,

Theodore M. Hess-Mahan BBO #557109
Shapiro Haber & Urmy LLP
75 State Street
Boston, MA 02109
(617) 439-3939


MILBERG WEISS BERSHAD
   HYNES & LERACH LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058


Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Sonus.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

INFORMATION DYNAMICS, LLC ("Plaintiff") declares:

1.   Plaintiff has reviewed a complaint and authorized its filing.

2.   Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|
| Sonus (4,000 shares) | Purchase | 2/10/04 2/11/04 | $6.56 |

2000 of these shares were purchased by the LLC at $6.76. 2000 were purchased by the LLC's pension plan at $6.56. I am also the PS plan trustee.

5.   During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below:

None

6.   The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

- 1 -

S:\Class Startup\Forms\Cert\InformationDynamics.doc                SONUS

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12 day of _February_____, 2004.

INFORMATION DYNAMICS, LLC

By: _____

    Thomas W. Corson

Its: Managing Member_____

S:\Case Startup\Forms\Certs\InformationDynamics.doc    SONUS